```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
TAIMUR JAMIL,                        :
                                     :
                                     :   16 Civ. 1972 (JSR)
     Plaintiff,                      :
                                     :       OPINION
        -v-                          :      AND ORDER
                                     :
SOLAR POWER INC.,                    :
                                     :
     Defendant.                      :
-------------------------------------x
```



JED S. RAKOFF, U.S.D.J.

In this decision, the Court undertakes the task of valuing 475,000 shares of restricted common stock that defendant Solar Power Inc. failed to transfer to plaintiff Taimur Jamil in breach of their employment agreement. After the Court scheduled a bench trial for this purpose, the parties jointly asked the Court to determine the value of the securities on the record as it stands, and, while this has meant that more inferential reasoning has been utilized in setting the value than might have been the case if the valuation had been the subject of a trial, the Court, acceding to the parties' request, hereby renders a final determination of the amount due.

The background of this case is set forth in the Court's decision on summary judgment, familiarity with which is here presumed. See Memorandum dated Nov. 7, 2016, ECF No. 25. Briefly, Solar Power and Jamil entered an employment agreement on April 16, 2015 under which Jamil was awarded, or had the potential to be awarded, various blocks of restricted common stock. On November 3,

1

2015, Solar Power fired Jamil without having transferred any of the stock. On Solar Power's motion for summary judgment, the Court found that Solar Power had breached the contract by failing to transfer a total of 475,000 restricted shares and by failing to make a severance payment due under the agreement.

The trial on damages was initially scheduled for December 9, 2016. However, before that date arrived, the parties informed the Court that Jamil had taken no discovery on either the nature of the shares' restrictions or their impact on the value of the securities. See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion in Limine, ECF No. 27, at 4. The Court therefore adjourned the trial for one month, so as to allow the plaintiff to take additional discovery on these questions. Yet no such discovery was taken, and, on the morning the trial was to commence, the parties stipulated to the answer to what they said was the sole remaining disputed issue of fact: whether the securities, in addition to being subject to contractual restrictions in the form of vesting periods of varying lengths, were also subject to holding periods under the Securities Act of 1933 and its implementing regulations. The answer was in the affirmative and the parties therefore stipulated that the securities were restricted within the meaning of the Securities Act. Having done so, the parties requested that the Court make the requisite valuation on the basis of the record before it, and the Court agreed to their request. See Transcript dated Jan. 27, at 25-27.

On the basis of that record, the pertinent facts are as follows. Solar Power breached the parties' employment agreement by failing to transfer 475,000 shares of "restricted common stock" to Jamil. See Memorandum dated Nov. 7, 2016, at 12-14. The contract did not define that term, but did set forth restrictions in the form of vesting periods – essentially, simple holding periods – of varying lengths. These holding periods were the only contractual restrictions on the securities, but some of the stock was also subject to the aforementioned legal restrictions.

More specifically, the record is clear that on April 16, 2015, Solar Power breached the employment agreement by failing to transfer 260,000 restricted shares (the "Miscellaneous Stock"), which were to vest in 25% increments on the anniversary of Jamil's employment date, with the first set of 65,000 shares to vest on April 16, 2016, the second set to vest on April 16, 2017, and so forth. See Transcript dated Jan. 6, 2017, at 26-27; Pre-Trial Consent Order, ECF No. 36, at 3. Also on April 16, 2015, Solar Power breached the employment agreement by failing to transfer 35,000 restricted shares (the "Sign-On Restricted Stock"), which were to vest 60 days later. See Transcript dated Jan. 6, 2017, at 26; Pre-Trial Consent Order at 3. Finally, on November 3, 2015, Solar Power breached the employment agreement by failing to transfer 180,000 restricted shares (the "Time-Based Restricted Stock"), which were to vest immediately and thus were not subject to any contractual restrictions. See

Transcript dated Jan. 6, 2017, at 25-26; Pre-Trial Consent Order at 3.

All 475,000 shares were also "restricted securities" within the meaning of SEC Rule 144, which provides an exemption from the registration obligations of the Securities Act if, among other requirements, the recipient of the shares satisfies a holding period. See 17 C.F.R. § 230.144(d). More specifically, the parties agree that the 475,000 shares at issue were subject to the six-month holding period applicable to the unregistered securities of an issuer that is "subject to the reporting requirements of section 13 or 15(d) of the Exchange Act," as was Solar Power. See id. § 230.144(d)(1)(i); Barbara v. MarineMax, Inc., No. 12-cv-0368 (ARR), 2012 WL 6025604, at *1 (E.D.N.Y. Dec. 4, 2012) ("The 'general rule' under the Securities Act is that the holding period shall be six months if the issuer of the securities is subject to certain reporting requirements and one year if the issuer is not subject to such reporting requirements."); Transcript dated Jan. 6, 2017, at 25-27.

Finally, the parties agree that the mean over-the-counter share prices for unrestricted Solar Power common stock were $2.01/share on April 16, 2015 and $1.87/share on November 3, 2015. See Transcript dated Jan. 6, 2017, at 25-27.

Under New York law (which governs the contract here applicable), the damages for failing to transfer securities in breach of contract is the fair market value on the date of the

4

breach. See Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971). "The general rule is that the market price of a security should be discounted to reflect the decrease in value, if any, due to a restriction on its transferability." See Waxman v. Envipco Pickup & Processing Servs., Inc., No. 02-cv-10132 (GEL), 2006 WL 1788964, at *3 (S.D.N.Y. June 28, 2006).

The size of the discount is a question of fact that depends on the nature of both the issuer and the restrictions, and is typically informed by expert testimony. See id. at *4. But not here. Rather than introduce evidence, expert or otherwise, as to how the restrictions affect the value of the securities, Jamil and Solar Power have gambled on who bears the burden of proving the discount rate, with each contending it was the other's responsibility. Thus, in effect, Jamil argues that there should be no discount at all, and Solar Power argues that there should be a discount of 100%, each position being a product of each party's argument as to who bears the burden of proof. (However, Solar Power concedes that it at least owes nominal damages for breaching the employment agreement. See Transcript dated Jan. 6, 2017, at 29-30.)

The Court concludes that there should be some discount, but that Solar Power bears the burden of proving the discount rate. More precisely, the burden of uncertainty arising from both parties' failure to prove the discount with mathematical precision falls on Solar Power. Under New York law, where "the non-breaching party has proven the fact of damages by a preponderance of the evidence, 'the

burden of uncertainty as to the amount of damage is upon the wrongdoer.'" See Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016) (quoting Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926 (2d Cir. 1977)) (emphasis in original). Thus, after a breach has been shown, as it has been here, a plaintiff need only provide "a stable foundation for a reasonable estimate" of the resulting damages. Id. The rule is no different where calculating the damages involves valuing restricted securities. Indeed, the leading case simply notes that where securities are restricted, "then the market value would have to be discounted in some way." See Simon, 269 N.E.2d at 27.

Solar Power nonetheless argues that it owes only nominal damages for breaching the contract because Jamil failed to prove the discount rate applicable to the restricted securities. In particular, Solar Power places great weight on a Third Circuit decision, Rochez Bros., Inc. v. Rhoades, which treated the burden of proving the discount as part of the plaintiff's burden of proving damages, and held that, in a Rule 10b-5 securities fraud suit, evidence of "the actual restrictions on the stock and the over-the-counter bid and asked prices" of the unrestricted stock is legally insufficient to calculate the value of restricted shares. See 527 F.2d 891, 894-95 (3d Cir. 1975). But Rochez Bros. is inapposite. To begin with, the record in this case contains evidence superior to the inherently uncertain bid and asked prices available in Rochez Bros., for here the parties have stipulated to the mean over-the-

counter share price on the dates of breach, as derived from actual market transactions. More fundamentally, whatever the rule may be in the Third Circuit for proving securities fraud damages, the rule under New York law for proving contract damages after a breach has been established is materially different, as described above, and it is the New York rule that is binding on this Court. See Cynergy Holdings, 839 F.3d at 141-43.

In the latter regard, Solar Power points to two cases from this district that, it contends, applied the reasoning of Rochez Bros. to questions of damages under New York law, namely, Waxman v. Envipco Pickup & Processing Servs., Inc., No. 02-cv-10132 (GEL), 2006 WL 1788964 (S.D.N.Y. June 28, 2006) and BrandAid Mtkg. Corp. v. Biss, No. 03-cv-5088 (WHP), 2008 WL 190494 (S.D.N.Y. Jan. 22, 2008). But, quite aside from the fact that neither of these decisions is binding on this Court, Solar Power misreads both these cases. Waxman does no more than reference the approach taken in Rochez Bros. and expressly reserves decision on the possible consequences of a plaintiff's failure to prove the discount rate. See Waxman, 2006 WL 1788964, at *4 n.8. As for BrandAid, the court there discounted certain restricted securities by 100% not only because the plaintiff failed to prove their value, but also because there was abundant evidence that the securities were worthless. See BrandAid, 2008 WL 190494, at *5-6 (awarding $1 in nominal damages where the company had "liabilities far exceeding its assets" around the time it issued the restricted securities and soon met an "abrupt demise"). Here, of

7

course, there is no comparable evidence that Solar Power was on the cusp of failure or that its restricted securities were worthless. To the contrary, the parties agree that Solar Power's unrestricted common stock was worth between $1.87 and $2.01 per share at the relevant times.

Even more fundamentally, this entire debate is academic, because the issue of the burden of proof on damages is ultimately irrelevant in this case. This is because both Jamil and Solar Power – who, it will be remembered, do not dispute any underlying facts – have jointly provided the Court with the requisite "stable foundation" to calculate the damages in this case. In particular, the parties agree that the mean over-the-counter share price of unrestricted Solar Power common stock had fallen to $1.87 on November 3, 2015 (the date of breach for the Time-Based Restricted Stock) from $2.01 on April 16, 2015 (the date of breach for the other blocks of stock). Based on this undisputed information - and in the absence of any other information, as a result of the parties' joint decision to forgo a bench trial - a reasonable estimate of the rate at which the restrictions (which were solely short-term time restrictions) affected the value of the securities on the dates of breach would be to assume that the value of Solar Power's unrestricted common stock was falling steadily at that rate – which works out to seven-hundredths of a cent per day - and to multiply that rate by the relevant holding period. This method reasonably approximates the sole effect of the restrictions in forcing

plaintiff (if he had received the stock) to hold the securities over a period of time when their value was declining in accordance with the stipulated market prices. While still just an estimate, this approach easily satisfies the requirements set forth in Cynergy Holdings. See 839 F.3d at 141.

The results are as follows. With respect to the Time-Based Restricted Stock, the mean over-the-counter share price for unrestricted Solar Power common stock was $1.87 on the date of breach, and these shares were subject to a six-month holding period.[1] So, multiplying seven-hundredths of a cent per day by 180 days results in an estimated decrease in share price of $0.126, and an approximate share price of $1.744 on the date when the restrictions on these shares would be scheduled to lift. Multiplying that share price by 180,000 shares results in a value of $313,920.00 for the Time-Based Restricted Stock.

The mean over-the-counter share price for unrestricted Solar Power stock was $2.01 on the date of breach for the other blocks of

---

[1] The statutory and contractual holding periods run concurrently, because both run from the date Jamil was to receive the shares. Under the contract, Jamil was to "receive" the Miscellaneous Stock on the April 16, 2015, with 25% of these shares "to vest on the first anniversary of the Effective Date and each anniversary date thereafter." See Employment Agreement, Ex. A to Compl., ECF No. 1, at 2; see also id. at 1 (similar structure for the Sign-On Restricted Stock). Similarly, as relevant here, the six-month holding period under Rule 144 runs from "the date of the acquisition of the securities from the issuer." See 17 C.F.R. § 230.144(d)(1)(i). Thus, the Rule 144 holding period only applies where the contractual holding period is less than six months, i.e., to the Time-Based Restricted Stock (no contractual holding period) and the Sign-On Restricted Stock (60-day period).

9

stock. Performing similar calculations for these shares results in the following values:

- Sign-On Restricted Stock (35,000 shares, 180-day holding period): $65,940.00;
- Miscellaneous Stock, block 1 (65,000 shares, 365-day holding period): $114,042.50;
- Miscellaneous Stock, block 2 (65,000 shares, 730-day holding period): $97,435.00;
- Miscellaneous Stock, block 3 (65,000 shares, 1095-day holding period): $80,827.50; and
- Miscellaneous Stock, block 4 (65,000 shares, 1460-day holding period): $64,220.00.

The damages for failing to transfer the 475,000 restricted shares is therefore $736,385.00. The parties agree that the damages for failure to pay Jamil's severance is $19,583.33, see Pre-Trial Consent Order at 3, so the total damages owed to Jamil for breaching the employment agreement is $755,968.33.

Jamil also seeks an award of prejudgment interest on these damages. "In a diversity case, state law governs the award of prejudgment interest." Schipani v. McLeod, 541 F.3d 158, 164 (2d Cir. 2008). Under New York law, in a breach of contract action, "prejudgment interest must be calculated on a simple interest basis at the statutory rate of nine percent" per year, with certain exceptions that are not relevant here. See Marfia v. T.C. Ziraat

Bankasi, 147 F.3d 83, 90 (2d Cir. 1998); N.Y. C.P.L.R. §§ 5001(a), 5004.

The parties dispute the date or dates from which the prejudgment interest should be calculated. New York law provides that interest "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b). Jamil prefers to measure the prejudgment interest from the dates of breach, whereas Solar Power argues that the Court should use January 13, 2017 as a "reasonable intermediate date."

The Court will use the dates of breach, as the "earliest ascertainable date[s]" that Jamil's contract claims accrued, to measure the prejudgment interest. See Bison Capital Corp. v. ATP Oil & Gas Corp., 884 F. Supp. 2d 57, 59-60 (S.D.N.Y. 2012). While it may be within the Court's discretion to calculate prejudgment interest from a single intermediate date, see Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 435 (S.D.N.Y. 2004), Solar Power has offered no meaningful basis for doing so. Solar Power's argument that the Court should measure the prejudgment interest from January 13, 2017 relies on the flawed analogy of restricted securities to lost profits, a class of damages for which at least one court used

11

an intermediate date because no such profits would have materialized on the date of breach. See Washington v. Kellwood Co., No. 05-cv-10034 (SN), ECF No. 187, at *6 (S.D.N.Y. Mar. 3, 2016). Because Jamil would not have been able to sell the securities on the dates of breach, Solar Power reasons that Jamil, like the plaintiff in Washington, sustained no damages on those dates. Here, however, since the Court has no trouble calculating the value of these securities on the dates of breach, the Court finds defendant's argument distinctly unpersuasive. Jamil suffered damages on the dates of breach and the prejudgment interest will be measured from those dates.

As previously explained, Solar Power breached its obligations to transfer the Sign-On Restricted Stock and Miscellaneous Stock on April 16, 2015, causing Jamil $422,465.00 in damages, and breached its obligations to transfer the Time-Based Restricted Stock and severance payment on November 3, 2015, causing Jamil $333,503.33 in damages. Using the statutory 9% simple annual interest rate, prejudgment interest in the amount of $105,565.09 as of the date of this Opinion and Order (1/30/17) will be awarded on these damages.

Finally, Jamil has filed a motion pursuant to Rule 25(c) of the Federal Rules of Civil Procedure to substitute Solar Power Inc.'s putative successor-in-interest, SPI Energy Co., Ltd., for the named defendant. See Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Substitute Successor in Interest as Named Defendant, ECF No. 41. Solar Power does not oppose Jamil's motion.

Nonetheless, "[b]efore granting a motion for substitution, a court must determine that a party is, in fact, a successor-in-interest." See Software Freedom Conservancy, Inc. v. Best Buy Co., Inc., No. 09-cv-10155 (SAS), 2010 WL 4860780, at *3 (S.D.N.Y. Nov. 29, 2010) (internal quotation marks omitted).

The Court is satisfied that SPI Energy Co., Ltd. is the successor-in-interest to the named defendant. In particular, the Court was furnished with a 2015 merger agreement providing that "the obligations of [Solar Power Inc.] under or with respect to contracts or agreements . . . shall become the lawful obligations of SPI Energy [Co., Ltd.]," which "hereby expressly adopts and assumes all obligations" of Solar Power under the assumed contracts. See Second Amended and Restated Agreement and Plan of Merger and Reorganization § 4.3, Ex. 3 to Decl. of Jay B. Zimner, ECF No. 42. And in January 2016, SPI Energy Co., Ltd. became the "successor issuer" to the named defendant. See SPI Energy Co., Ltd. Form 6-K (Jan. 2016), Ex. 6 to Decl. of Jay B. Zimner. Accordingly, the motion to substitute is hereby granted.

For the foregoing reasons, the Clerk of the Court is directed to close docket entries 31, 37, and 45, to substitute SPI Energy Co., Ltd. for the previously named defendant (Solar Power Inc.) in the caption of this case, and to enter final judgment holding SPI Energy Co. liable to Taimur Jamil in the sum of $861,533.42 effective January 30, 2017.

SO ORDERED.

Dated:  New York, NY
        January 30, 2017

JED S. RAKOFF, U.S.D.J.

14